UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA, New York, N.Y.

v. 13 MAG 828 (RWS)

ALEX PUZAITZER,

Defendant.

------------------------------x

April 11, 2013
3:20 p.m.

Before:

HON. ROBERT W. SWEET,

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
BY: JASON MASIMORE
Assistant United States Attorney

GERALD SHARGEL
ROSS KRAMER
Attorneys for Defendant

Also Present: Special Agent Rebecca Vassilakos
Special Agent Denielle DeBoer
Lisa Chan, Pretrial

THE DEPUTY CLERK: All rise.

(Case called)

THE DEPUTY CLERK: Government, are you ready?

MR. MASIMORE: We are. Good afternoon, your Honor. Jason Masimore for the government. With me at counsel table are Special Agents Rebecca Vassilakos and Denielle DeBoer.

THE COURT: Thank you.

MR. SHARGEL: Good afternoon, your Honor, Gerald Shargel and Ross Kramer for the defendant.

THE COURT: Nice to see you, Mr. Shargel.

MR. SHARGEL: Nice to see you as well, Judge.

THE COURT: Long time.

MR. SHARGEL: Very long time.

THE COURT: Yes, pleased to hear you.

MR. SHARGEL: May I proceed?

THE COURT: Yes, please.

MR. SHARGEL: Your Honor, I would like to --

THE COURT: Excuse the interruption. Yes.

MR. SHARGEL: I'd like to go right to the core of what I see as the issue before your Honor in this de novo review of what happened before Magistrate Judge Fox, and I'd like to -- and when I say I'd like to go to the core, I suppose I can put it directly by saying I'd like to discuss the weapon, the gun that was seized at the house at the time of the arrest and search of the house.

I put it in the following context, your Honor. The following context is that six other people charged in the same fraud conspiracy in count one of the complaint and charged, all charged with the extortion contained in count two of the complaint, were released on various conditions. My client was the only person who was not released on those conditions, and the focus was very heavily laid on this weapon. I'd like to say something about that, if I may.

This investigation into, particularly into the extortion component of the case, began in March of 2012, more than a year ago. And during that year, with the agents carefully monitoring conversations, debriefing cooperating witnesses, studying this matter carefully during that year I emphasized that there was no gun brandished, there was no gun discussed, there was no gun ever displayed to anyone. There was no gun used in connection with this offense. The gun was found in the house in Mr. Puzaitzer's home office. It was high on a shelf. And, yes, it was in a holster and, yes, it was loaded, but there is never -- there is nothing in this record to indicate that it was used in furtherance or in connection with these charges. In fact, when the agents went to the house, they weren't expecting to find a gun. There was nothing in the search warrant that suggested that a gun was being sought, that had been discussed, that it had been discussed by anyone. And I think under the circumstances this should be put

in the proper context.

But even having said that, there is nothing in Section 3142, there is nothing in the Bail Reform Act that suggests there is no law, there is no rule, there is no presumption, there is nothing to suggest that if someone is arrested with a weapon in a house -- don't forget, this is not a situation -- I understand the felon in possession issue, I understand it full well. But this was not a situation where someone was found on the street and when arrested, patted down, a gun was discovered. There is no suggestion that my client ever had this gun on the street. There is no suggestion that he ever had a gun in his possession outside the home. The gun was in the home. And I think that under those circumstances and recognizing full well that there is no law that says if one possesses a gun or found in possession of a gun, even a felon -- going back to 1990, as your Honor knows that, there was one felony conviction and it went back to 1990. I state parenthetically that others who were released on conditions in this very case, had felonies in their background. But there is nothing to suggest that this gun was used. I think that is critically important. Nothing to suggest that that was part or intertwined with the offense here in any way.

But having said that, the Government takes the position, as it took before Magistrate Judge Fox, and you saw in their submission, the government takes the position that

Mr. Puzaitzer is a danger to the community. And then they beliedly or back of their hand saying, and there are no conditions or combination of conditions that could ensure the safety of other persons or the community.

The original offer, the original offer before Magistrate Judge Fox was -- prior counsel asked for a bond of $1.5 million secured by a home, his own home. We -- and even at that time, your Honor, even at that time Pretrial Service, recognizing that there was a concern, as it's stated in that report, about danger to the community, no one was pressing risk of flight. No one has suggested, even the government in its most recent papers does not suggest risk of flight. And that's why I'm keying in and concentrating on this issue.

The idea that, the idea that $1.5 million and then Pretrial Services recommending, recommending that Mr. Puzaitzer be released, that he be released on bond with conditions. And the conditions that were proposed by Pretrial Services were substantially different than what I'm proposing now. The conditions did not involve home detention. The conditions did not involve monitoring. None of that. They said that he should be released on a bond, set forth the conditions. And you have Exhibit B to -- and I'm sure you have from Pretrial Services directly -- Exhibit B to our papers that we submitted, demonstrate that this is an entirely different package. So here we have the government taking the position that there is

no condition or combination of conditions. They don't really discuss the conditions we propose. They don't really discuss the 30 letters, 30 character letters of people here who are here to support Mr. Puzaitzer.

But here's what we've done. We've put together a package that cannot possibly be dismissed. That was our intention, that was our purpose, to put together a package that would unquestionably, unquestionably alleviate any suggestion that my client is a danger to the community. And that package is a package of $6 million in equity, $6 million, and $6 million in equity and property, some out -- that are owned outright. You've seen that in the papers. And people who have stepped forward people who wrote letters, but not only wrote letters, said that they would be willing to post their homes. And they understand full well that if Mr. Puzaitzer were to violate any condition, not simply flight, but any condition of his release, that their properties would be subject to forfeiture, and yet they are willing to come forward and put that in place. They're willing to put a bond like that in place.

And we also have a suggestion that there be home detention. As I said earlier, Pretrial Services didn't say that. The lawyer who argued on his behalf before Judge Fox didn't say that. I'm saying that. I'm saying complete home detention with the strictest of conditions of release, the

strictest of conditions. And I suggest, most respectfully, that there is nothing to suggest that my client would do anything that would violate those conditions. There is nothing to suggest after this gun has now been removed from the home, there is nothing to suggest that he has access to weapons. There is nothing to suggest that he has any intention, design or plan to harm or interfere or obstruct in any way.

The situation that we have now with these conditions that I've put before you provide what the courts call moral suasion, moral suasion. Even his daughter's home is put at risk -- his daughter recently married, and her home is put at risk. That is moral suasion. And the friends that have stepped forward to support him, the friends that have submitted letters, and have also said that they would post their homes in this stunning amount, that even they recognize that Mr. Puzaitzer would not compromise their interests in their homes that they've lived in for years. That's more moral suasion than simply to say let's put up some money or contribute money. These are people who risk having their homes taken away if he were to violate any condition. And Mr. Puzaitzer full well recognizes that.

And I think under the circumstances, your Honor, with that kind of bail package that no one has submitted up to this point, that he is a perfect candidate for release. I think in light of the cases that I cited in the memorandum, that it's

not the normal case where someone should be detained. It's the case where the district court has or where the reviewing court has exhausted all efforts to come up with conditions or combination of conditions and, under no circumstances, could -- conditions or combination of conditions be found. This is not that case.

Let me add, if I may, Judge, one other component. This is a situation, this is a situation where the charges in the complaint carry at present an estimated guideline range in the area of some two years, two years. That's stunning. And even the felon in possession charge is a level 14 in the guidelines. There is nothing here to motivate flight, to motivate obstruction, to motivate interference -- not to suggest Mr. Puzaitzer would ever engage in obstructive conduct. I mean, the conversations are what they are. They're yet to be studied further. The conversations, many of the conversations were recorded in the Russian language, or Russian dialogue, and we have a whole lot of work to do in the days and weeks and months ahead, no question about that. But, your Honor, I think that under all of the circumstances, that this is a case where my client is a perfect candidate for release. Thank you.

THE COURT: Thank you, sir.

Yes.

MR. MASIMORE: Yes, your Honor. Thank you.

Few things, your Honor. This is not a case where the

government is seeking detention simply because there is a gun in the house. I think the situation here, your Honor, has to be viewed through the lens of count two, which is the extortion count. And so what we have here is someone who's been convicted of a felony, someone who's been recorded making threats and discussing threats, someone who was present for a meeting during which a victim was threatened with being shot with two slugs in the chest, that possessed a firearm.

In addition, when the agents went to arrest Mr. Puzaitzer at his home, as a matter of safety they initially -- they initially asked him whether there were firearms in the house -- excuse me, your Honor -- and he denied that there were firearms in the house. And, of course, this was found in his house.

Also is important, because one of the, one of the restrictions that the defense proposes that will maintain the state of to the community is a strict gun ban. Of course as a felon having been convicted before, he was already under a strict gun ban, and did not abide by that. So that's important information for the Court to consider.

On the letters, your Honor, I think that the letters that were submitted cut the other way in analyzing whether or not he remains a danger not community. It's obvious from the letters that Mr. Puzaitzer already, at the time where he lived and where he operated, already enjoyed a very fine reputation

in that community. And even though he had that reputation with his friends, his loved ones and the other people who submitted letters, he still committed the extortion that's charged in count two. He still engaged in that dangerous behavior. And so just having people sign papers -- defense talks about moral suasion. He was already subject to moral suasion by his membership in this community and not letting them down. And he certainly didn't worry about that when he was extorting the victim in this case.

I think what you have here, your Honor, if you look at the letters is a very carefully manicured perception in the community that this defendant maintained. And this is what makes him particularly dangerous; that he could appear so loving and generous to a large segment of the community, but at the same time behind their backs, when he isn't aware that he's being recorded, to say the things that he did.

I was particularly struck, your Honor, by a number of the letters that talked about how much Mr. Puzaitzer values family. And, again, it's a lens through which to view the extortion that's charged, knowing that he loves family and understands how important family is. Nonetheless, he talked about threatening the defendant by -- and, in fact, did take steps to threaten the defendant by going after the victim's father's medical practice. And there is a recording that I mentioned in the detention memorandum, your Honor, where he's

talking about having a friendly chat, quote unquote, with the victim's wife. So here's somebody that the letters demonstrate understands the significance and importance to somebody of family, and yet was dangerous enough to threaten somebody's family.

And so, your Honor, we do think for the reasons I cite in the detention memorandum -- I cited the specific language that the defendant used in these various calls -- it's very strong evidence. It's intercepted communications. I submitted a photograph, your Honor, which I think, you know, a picture is worth a thousand words. When you see Mr. Puzaitzer behind the victim and the victim's head in his hands, keep in mind at the time that photograph was taken the victim was not cooperating with law enforcement. The FBI happened to be siting in the booth next to them and could observe this and take photographs. But it's very clear from that photograph, if you look at that, and look at how this extortion was applied and the pressure was applied to the victim, that it's clear that the defendant is a danger. And we believe there are no conditions that would reasonably assure the safety of the community given the, as I said, perfectly manicured perception he's maintained in the community versus what he's doing behind closed doors, without regard to even maintaining that perception in the community.

MR. SHARGEL: Your Honor, may I proceed?

THE COURT: Of course.

MR. SHARGEL: Your Honor, first it's interesting to note, as I said it before, this was an investigation or this was -- and the events that led to the culmination of this investigation took place over a year. It started in the middle of March 2012, and the arrest in the case was on April the 4th. During that entire period of time, during that entire period of time when CC-1 was obstinately refusing to resolve the issues that were essentially being fueled by investigators at some point, there wasn't a hair on his head that was out of place. No one touched or slapped or beat or kicked or bruised this individual.

Now, this is a charge that we're going to deal with. But the government talks about the strong evidence in the case. That is one of the criteria under 3142. But there is another point to be made, because the government is so dismissive both in its writing, and again here this afternoon. The government is so dismissive of the letters that have been written on Mr. Puzaitzer's behalf. But there is another part of 3142 that says that the Court should consider the history and characteristics of the defendant, his role -- and I'm paraphrasing now -- but his role in the community and how others regard him. And there is no rule, in that order of criteria, at which you, the Judge, is required to look, that suggests that one trumps the other. And these are characteristics that should be examined. But I don't think

that the 30 letters or something, that should be dismissed. These are heartfelt letters. Your Honor had an opportunity to read them. These are heartfelt letters by people who have enormous respect for this defendant.

I think under the circumstances, once again -- and by the way, you see the writers. I was particularly struck by the 13 year old young girl who lost her mother and spoke with Mr. Puzaitzer's of how he supportive he was during this period of time. This is a broad array of letters. We have religious leaders, his Rabbis are here in the Court this afternoon. This is someone who will respect the processes of the Court. This is someone who would respect the conditions of release. And I think that the conditions of release that I've proposed are so strong, so emphatically and profoundly strong, that the moral suasion that it affords, including not only his own house -- the last time it was his own house. When I say last time, at the appearance before Judge Fox. That's not what we have here. Now we have people stepping forward and saying we believe in this man. Thank you.

THE COURT: Thanks very much. This is a difficult issue. A skilled magistrate has ruled on it. Now I have it. There's no doubt that the conditions of the proposed bail conditions will secure the defendant's appearance. I don't think there is any question about that. I think the only issue is the one raised by the government, and that is the danger to

the community, and particularly the danger to those who are involved or tangentially involved. I don't know any real details, cooperators, and so on.

The danger to the community is certainly much ameliorated by the proposed electronic monitoring, but that does not stop communication. And I know of no way to prevent communication.

There is some suggestion, and I'll grant you it is only a suggestion, that with respect to the previous threats or conduct, that there are other forces that might be brought into play in this situation.

So I find it a very close question, but I'm going to deny the bail application without any prejudice. When this case moves along, I'm sure there will be an opportunity to review this decision. But I do it on the -- because I am concerned about the possibility of conduct violating the provisions of bail that couldn't be traced.

So I'm going to deny the application. And, Mr. Shargel, I encourage you to renew it if you think you can solve my problem.

Anything further?

MR. MASIMORE: Your Honor, just very briefly. At the initial presentment the defendant asked to be indicted within 14 days.

Upon having communications with new defense counsel,

it's my understanding that they're waiving to the 30th day, and so we would ask that the Court would continue the time within which the preliminary hearing be held until April 3rd, 2013 -- I'm sorry -- May 3rd, 2013, which would be the 30th day.

MR. SHARGEL: That's true. I agree. But may I just put something else before --

THE COURT: Yes.

MR. SHARGEL: I understand that you're sitting in Part One for the rest of this week and for next week as well?

THE COURT: Yes.

MR. SHARGEL: So I understand your Honor's concern, but I respectfully ask that you look out for -- I think that I can meet or satisfy those concerns.

THE COURT: Well --

MR. SHARGEL: I have --I've done it in the past.

THE COURT: If there was a way that I could escape this duty, I would.

MR. SHARGEL: I'm not talking about escaping the duty. I'm saying --

THE COURT: No, I'm talking about next week.

MR. SHARGEL: Oh.

THE COURT: If I could get out of it, I would, but I don't think I can. So I will be here.

MR. SHARGEL: Well, now that you're here --

THE COURT: Well, I'm here now, yes.

MR. SHARGEL: And in the week ahead I hope to be back before you on a motion for an argument.

THE COURT: Well, it's always a pleasure to see you, and even in a difficult circumstance of this kind. So I'll be here.

MR. SHARGEL: Thank you, Judge.

THE COURT: Okay. Thank you, all.

(Adjourned)