UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 13 Mag. 828

ALEX PUZAITZER,

Defendant.

------------------------------x

New York, N.Y.
April 18, 2013
4:40 p.m.

Before:

HON. ROBERT W. SWEET,

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
JASON MASIMORE
Assistant United States Attorney

GERALD SHARGEL
ROSS KRAMER
Attorneys for Defendant

ALSO PRESENT: CARLOS RAMIREZ
REBECCA VASSILAKOS
THOMAS ZUKAUSKAS

(Case called)

MR. MASIMORE: Good afternoon, your Honor, Jason Masimore for the government. With me at counsel table are special agents Rebecca Vassilakos and Thomas Zukauskas. We also have pretrial services officer Carlos Ramirez.

MR. SHARGEL: Good afternoon, your Honor.

THE COURT: Thanks, Mr. Shargel.

Let me ask the government. I'm sorry to reveal ignorance. I'll always sorry to reveal ignorance and it seems to happen, I won't say more often than not, but my question is this. I don't understand the part I aspect of this procedurally.

MR. MASIMORE: Your Honor, procedurally what's going on is, we are on a complaint so far, so there has been no district judge assigned to the case. And so that's why it came to part I in the first instance.

Magistrate Judge Fox initially ordered the defendant detained upon his arrest. And so when we were before your Honor last Thursday, the defendant made an application for a district judge to make the ruling, as is his right. Towards the end of that proceeding, when you denied --

THE COURT: What's going to happen ultimately with all of this and when will that happen?

MR. MASIMORE: Right now there is a preliminary hearing date set for May 3. So if nothing changes right now,

the defendant can expect an indictment on or about May 3, at which time it would get wheeled out to a United States District Judge. And, obviously, we have no idea who that will be because it's left to the wheel.

THE COURT: Understood.

Mr. Shargel. Perhaps you would like to address what the government has told me in its memorandum.

MR. SHARGEL: Yes. The new wrinkle in the case. The new wrinkle in the case is that last evening we received a submission from the government where they now claim, having said that they weren't claiming, but they now claim that Mr. Puzaitzer is a risk of flight. He is clearly and absolutely not a risk of flight and I would like to state the reasons why.

I want to start by noting that the updated pretrial services report recognizes that there may be an issue with respect to both danger and risk of flight, but recommends conditions, it recommends that there are conditions that could address both of those issues and on conditions that are far less stringent and far less strict than anything that I've put before your Honor. They recommend that he be released on bond, that he be released on conditions. I think that's a good starting place.

But it goes beyond that, your Honor, if I may. Now that we have that issue I would like to put certain facts

before you to demonstrate and demonstrate clearly and profoundly that my client is not a risk of flight.

First start out by telling you he's 52 years old. He was born in Odessa in the Ukraine, but he has been living in the United States for more than 30 years. He came to the United States in 1979. He became a naturalized United States citizen, as his wife is, more than 20 years ago. He has no other citizenship. He left Russia as a Jewish refugee and surrendered his Russian citizenship. He holds only United States citizenship. He has no other travel documents. He only has a United States passport. He and his wife Mya have lived in the same Brooklyn address for the past 11 years. He has no property overseas, no homes overseas or anywhere else, Russia or anywhere else. He has no money overseas and no account overseas. His roots, your Honor, are American roots.

He has two children. He has three grandchildren. He has a mother that's in a nursing home. He has a sister who lives in New Jersey. He has strong ties to his family. And as well as that, I put before you conditions that would address any such issue, just as pretrial services recommends.

That's not all that I have to tell you this afternoon, your Honor, because this afternoon I would like to tell you that the facts that have been put before you, the facts in conversations in last night's submission are plainly wrong. They are completely wrong. I want to tell you why they are

completely wrong. The government suggests that there were illicit, the word is used again and again in that 11-page submission, that there were illicit financial activities. There were no illicit financial activities. They are conflating two separate events to suggest that Mrs. Puzaitzer has signed documents having to do with issues that are in the complaint with a company named Dalton Alexander Goldschmidt, codefendant Alexander Goldschmidt's company. They make suggestions that she was somehow involved by signing those documents. She never signed such a document.

The government has the burden of proof on flight by preponderance of the evidence, on danger by clear and convincing evidence. There is no such document that's been put before you. She did not sign such a document. Her appearance at the TD Bank that is looked at by the government with such suspicion had only to do with this, only to do with this. It had to do with the fact that as a result of Hurricane Sandy there was severe damage to their home in Manhattan Beach in Brooklyn. And after that damage they made an insurance claim, and the insurance claim was rejected. That was in October of 2012, Hurricane Sandy. And then in December, I think it's almost two months to the day, in December of 2012, she went to the bank to see if they could get a home equity loan to repair the home. That's what she was talking about on the telephone that has been so severely misinterpreted by the government.

That's what she was talking about, getting a loan. That can be documented. I couldn't do it by this morning, but that could be documented because she was at the bank.

That loan was denied as well because at the time she was not working for her husband's company, this Big Apple company. What Mr. Puzaitzer said to pretrial services it wasn't wrong, it wasn't false, it wasn't misleading. It was absolutely accurate. She was not working for them at the time. This is just wrong-headed information that was put before your Honor and in no way supports the suggestion -- just think for a moment. There are hundreds of bail applications that you had. What is it that leads from this contention that there was illicit financial activities that automatically the government thinks it enjoys the benefit of automatically jumping to risk of flight. There is nothing in here to suggest risk of flight.

And I want to go one step further. Much was made in the government's submission about the fact that Mr. Puzaitzer didn't provide a complete statement of his assets and liabilities in the interview with the pretrial services officer. Your Honor, let's think about how this all worked. This is a man who had surgery the day he was before arrested. He had dental surgery the day before he was arrested and the agents knew about it. He was brought to this courthouse after an arrest at 6:00 in the morning. He has hypertension. He suffers from hypertension. He suffers from high blood

pressure. He is brought into this building. He doesn't have a proper meal and he sits down and several hours later, without benefit of counsel, he is asked what his assets are and liabilities.

The information that he gave about his employment was true information. The information that he gave about his assets was true information. The fact that it didn't list every asset, investment, and partnership that he had does not suggest that he was doing something wrong or untoward.

Considering all the circumstances, considering the report of the pretrial services officer, this is nonsense that he's a risk of flight. This doesn't pass muster with the government's burden of showing by a preponderance of the evidence that he's a risk of flight.

Let me go one step further because this started out within the past several days. This started out as a motion for a reargument on the danger to the community aspect. Again, and I note this, and I enjoy noting it, as you might understand, that pretrial services, recognizing the potential of danger to the community, again says that an ordinary bond can address these issues. But your Honor said, and you made it plain, your Honor said that the last time we were here that what concerned you was the ability to pass messages. And what I wanted to do and what I did in my submission to you was simply to say this, that there are conditions that could address this concern.

There are conditions that could address this concern and address it well and it's been done in other cases.

I cited just a handful of cases, but in case after case after case, and your Honor knows full well, I've had my share of extortion cases, and in case after case after case, people have been released on bond.

Even going back to the pistol that was found. There is nothing in Section 3142 that says if you have a pistol or you're charged with extortion that you don't get out. There is no presumption that he is to be detained in this case. These conditions are so strict, there are so beyond what pretrial services had recommended, they are so beyond that that I think, under the circumstances, it is absolutely clear to strip him of all ability to communicate, to voluntarily consent. It's been done in other cases, for phones to be monitored, if they wish. It can be spot checks. It can be anything they want. Living with the idea of your phone potentially being monitored is essentially the same as monitoring the phones, psychologically.

I think under all of the circumstances, not only the recommendation, the deeply-placed roots in the New York community, the deeply-placed roots in the American community that I think under all those circumstances these conditions should work. They are almost punishing in and of themselves, but they should work.

And let me just say one thing more. Going back to

what was put before you by the Assistant United States Attorney at our last appearance and threats that were being made -- and the prosecutor was candid and fair. The prosecutor said, these statements were not made, the five bullet holes in the chest, these statements were not made by Mr. Puzaitzer. But they were made by others when he was present. He was present. Isn't it odd, Judge, that the people who actually used the words, the people who actually spoke the words, that they are released on bond? They are home as we speak. I don't even think they are under house arrest. But they are home and this man is sitting and languishing in a jail. With all respect to the prosecution, what sense does that make?

The issue that was placed before your Honor the last time that we were here was the possession of a gun. Was that right? Absolutely not. It wasn't right because Mr. Puzaitzer was convicted of a felony 25 years ago or so, I think it was in 1990. That's true. He should not have had the gun. But that doesn't mean that he's a present danger.

Actually, in United States v. Salerno and in 3142, it's not about whether he was a danger or the applicant is a danger in the past, applicant for bail or release. It's a question of whether in the future there is a danger. That's the issue. It's present or future dangerousness, again not what happened in the past.

Judge, I bow to your experience. I have made bail

applications to you going back to the 1970s. I believe that under all the facts and circumstances, a fair determination of these issues should result in my client's release.

THE COURT: Thank you.

Anything from the government?

MR. MASIMORE: Your Honor, I think the issue for this particular hearing is whether or not the two additional proposed conditions proposed by the defendant are going to protect the community. And we set forth in the brief a number of reasons why we believe they are not. They are not as enforceable. One of the arguments we made is they are not as enforceable as would be necessary to protect the community, and that's based on the rules that allow the Court to not forfeit the property if somebody merely violates a condition of release other than just simple nonappearance.

With respect to the bank application and whatnot, I am not sure that the argument makes it any better, that the defendant's wife was in a bank in connection with a loan application listing an employer where she is not employed. During the conversation between Mr. Puzaitzer and his wife about what she was being asked at the bank, she indicates that she doesn't know where to put that she works. So the point of all of this being cited in the brief is simply to say that restricting him to his immediate community, which is what would happen if he were allowed on home detention, where really

absent 24/7 surveillance, the only people around him are his family that can ensure that he abides by these conditions. For example, not sneaking him another cellular telephone, not e-mailing or sending or receiving e-mails.

The proposed conditions aren't as strong as they sound and not as strong as they look on paper when viewed in the context of the conversations that he was having and what was going on back during the time we were monitoring the interceptions.

Lastly, your Honor, we did, and we were candid about this in our brief, we did restrict our arguments earlier to risk of flight. But preparing this brief and looking at, well, how good are these conditions that the defendant proposes now, we were forced to look at various things that showed us that the finances that he listed weren't correct. I don't hear defense counsel to dispute that what he told pretrial services was not correct. What I heard is that he had a reason for not being correct, because he had dental surgery.

If pretrial services and if the Court doesn't have an accurate picture of his financials, then how can the Court set an appropriate bond amount that would assure his appearance. So given this discrepancy in his actual financial condition, we believe that that gives rise to an inference of flight in this case.

And at the very least, your Honor, if the Court is

considering bail, it should be conditioned on the defendant first correcting and amending his financial presentation so we do get a full picture so the Court can come up with some conditions that would assure his appearance.

I'm free to answer any other questions that the Court may have.

MR. SHARGEL: Judge, one, the fact is that Mrs. Puzaitzer said she was unemployed. She was not employed by Big Apple at that time. That's why the application for a loan was rejected. They didn't show sufficient income. That's number one.

Two, the idea that a bond doesn't provide specific assurance of flight and meeting the issues of flight is because, what? The conditions, if there is a violation of conditions, the sureter knows full well, they are told that by a magistrate judge, they are told that by an Assistant United States Attorney or a designee who is interviewing these people, they are told by me that any violation of conditions could result in forfeiture of the entire amount of the bond or a substantial part of the bond.

I've been involved in cases where bonds were forfeited because people didn't abide by the conditions. That's a well-known fact. There is a statute that provides for it. And they are facing severe financial consequences. But I'll go one step further and remind you respectfully, once again, the moral

suasion. Putting up that kind of property is more about moral suasion. It's not about people losing stocks and bonds. It's not about people losing cash. It's about people risking the loss of their property and homes to which they had become attached.

Finally, what Mr. Puzaitzer said to the pretrial services officer was correct. It was correct. But were there investments that he had? In other words, it's not the same at that early morning interview. It's not the same as filling out a financial statement.

THE COURT: The government has made this request that he complete a financial statement. Is that appropriate?

MR. SHARGEL: I'm willing to do that, willing to do that.

THE COURT: Thank you, all.

I am going to grant bail on the conditions stated in the April 16 letter. It is not stated in the letter, but the government requests a financial statement and that request, seems to me appropriate and defendant is willing to do it.

Finally, to the extent that this situation remains a problem, let me try to say -- wow. I guess I'm out of here. Presumably, if something goes amiss, the part I judge will handle it from there, or the magistrate.

I will say, as long as I have any responsibility in this matter, which I think may be only for another four days,

but as long as I have any responsibility, if there is any breach of any of the conditions, I would demand forfeiture. So that's my view of that. I don't think this follows me beyond this point.

Anything else the government would like?

MR. MASIMORE: Your Honor, we would ask that the defendant not be released at least until the conditions are met. One of the conditions is to have a landline that's set up for monitoring, which raises another issue. The government, we believe, shouldn't be responsible for the expense of monitoring his landline.

THE COURT: No.

MR. MASIMORE: As I understand it from speaking with the agents, I think the defense would have to hire an outside monitoring company and have that in place that would monitor it live and provide reports to the government on an ongoing basis. We would also ask, before he's released, that we do receive the newly-completed financial statement.

THE COURT: Mr. Shargel.

MR. SHARGEL: The only difficulty is the logistics with respect to a monitoring company. That's, I think, beyond the pale and I think that would be enormously expensive to do.

THE COURT: Is there a landline?

MR. SHARGEL: Yes.

THE COURT: That landline will be used and it can be

monitored by the government.

MR. SHARGEL: There are three landlines right now.

THE COURT: Then all three will be monitored by the government.

MR. SHARGEL: Very well.

THE COURT: Anything else?

MR. MASIMORE: Your Honor, who would bear that expense? The defense submission --

THE COURT: You will monitor it as much as you wish.

I think the government probably can determine all calls made from that phone. Something in my past indicates to me that they have that capacity.

MR. SHARGEL: True. There is something called, the luds and the muds. The luds --

THE COURT: Enough said.

MR. MASIMORE: I guess I'm confused here. As I understand it, the proposal is, we will be monitoring the contents of the conversations.

THE COURT: That's something I wonder. What are we going to do about that?

MR. MASIMORE: Because monitoring --

THE COURT: I understand your point. What are you going to do about that, Mr. Shargel? When you said monitoring, what did you mean?

MR. SHARGEL: That they would have the ability to

listen into a conversation.

THE COURT: Anything else?

MR. MASIMORE: Your Honor, would the Court consider an additional condition that would permit the government from time to time to monitor compliance with not having other devices, that is, the government can at various times enter the house and make sure that it is clean and free of all other electronic devices.

THE COURT: That's kind of a search, isn't it?

MR. SHARGEL: Judge, we are representing that we will not have any such devices. You have already said, and I think any like-minded judge would think that there are consequences to disobeying the conditions. We are not here to game the system. This is a situation where we are representing that there will be no other cell phones or smart phones or any communication device. It's limited to this.

THE COURT: I think that's right. I don't see how we can reasonably do more than that, frankly, unless there is some way, and I can't think of what it would be.

MR. SHARGEL: One other point just to recognize is that pretrial has the authority to stop by the house and, I guess, receive an assurance that there is nothing there, that there are no other cell phones.

THE COURT: Anything else?

MR. MASIMORE: Sorry to keep piecemealing this, your

Honor. As I understand it, the defendant will be released with an ankle bracelet, GPS monitoring system --

THE COURT: Whatever the standard home detention provisions are.

MR. SHARGEL: Yes.

MR. MASIMORE: Standard home detention. I'm getting an interesting look from Carlos Ramirez over here, so I will retreat to the other end of the table.

MR. RAMIREZ: Your Honor, Carlos Ramirez from pretrial services.

First, I don't even know what the conditions are, since you are referring to a letter that we have not seen. But if your Honor is talking about electronic monitoring, there are different forms of electronic monitoring. One is GPS, which is not something we normally use for defendants, especially in the city because there are problems with GPS. It's not like you're in the country.

THE COURT: Let's take a moment. You three talk.

(Pause)

MR. MASIMORE: Judge, I think we have what the Court will likely impose.

THE COURT: It struck me, I can just so order this letter.

MR. MASIMORE: It's a bit more complicated than that.

THE COURT: Be my guest.

MR. MASIMORE: I think your deputy is ready to write this down. What it would be, it would be a personal recognizance bond in the amount of $6 million to be secured by $6 million in equity in whatever properties and with whatever cosigners are necessary to meet that amount. He would be under home incarceration with electronic monitoring. He would be under strict pretrial supervision. Travel would be restricted to the Eastern and Southern Districts of New York, to the extent he is permitted to travel. He would provide a full accounting of his financial assets and liabilities to the U.S. Attorney's Office.

MR. SHARGEL: He would be permitted to go to religious services at the synagogue, he would be permitted to seek medical attention if that becomes necessary. That can be on notice, absent some dire emergency. And to go to his lawyer's office.

THE COURT: Yes, of course.

MR. SHARGEL: And one more request, and this would be, of course, on notice to not only the monitoring people, but pretrial services. As I said during my argument, his mother is in a nursing home in New Jersey. She can't travel.

THE COURT: Any visits that are necessary there.

MR. SHARGEL: So travel to New Jersey to the extent of going from home to the nursing home.

THE COURT: Yes.

MR. MASIMORE: I think we have covered this, but it needs to be in the bail order. Surrender of his passport and travel documents. No new applications.

MR. SHARGEL: The passport is in the custody of the agents at present.

MR. MASIMORE: During his period of home incarceration he would have limited visitation. He may only be visited by individuals who are listed on a preapproved list, a list that is preapproved by the government and pretrial services. During his period of home incarceration there can be no cell phones, smart phones, computers, or any other devices capable of electronic communication. None of those devices can be permitted in the residence at the time. Any landlines aside from the dedicated landline for home incarceration, the defendant will execute authority to monitor such phone lines. The monitoring can include the conversations, the contents of the conversations.

Additional conditions that other defendants in this case are required to meet and this defendant will be required to meet. He shall not contact or attempt to contact the individual listed as CC1 in the complaint. He may not be in contact with any other defendants unless counsel are present. Since he will be in home incarceration this is probably not applicable. But in case he is going to go to religious services or other places, he is not to be in the vicinity of 42

West 38th Street in New York, New York or 9020 Elmhurst Avenue, Queens, New York. And he is not to engage in the promotion of securities without prior notice to and approval of pretrial services.

MR. SHARGEL: I think that's it, your Honor.

MR. MASIMORE: I agree.

THE COURT: Those are the conditions. Anything further?

MR. SHARGEL: No, your Honor.

MR. MASIMORE: No, your Honor. The only thing is, if the cost of monitoring becomes a burden, I know you won't be on part I anymore, but I just want to reserve the government's right to make an application later.

THE COURT: Anybody can apply for anything at any time.

Thank you.

o0o