UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

v. 13 Cr. 410 (NRB)

ALEX PUZAITZER,

Sentence

Defendant.

------------------------------x

New York, N.Y.
April 13, 2015
3:10 p.m.

Before:

HON. NAOMI REICE BUCHWALD

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
JENNIFER E. BURNS
Assistant United States Attorney

GERALD SHARGEL
ROSS KREMER
JENNIFER BOURIAT
Attorneys for Defendant

ALSO PRESENT:
DENIELE DEBOER
Special Agent - FBI

(Case called)

THE CLERK: Is the government present and ready to proceed?

MS. BURNS: Yes. Jennifer Burns for the government. Joined today by Special Agent Deniele DeBoer of the FBI.

THE CLERK: Is defendant present and ready to proceed?

MR. SHARGEL: Yes, we are. Gerald Shargel, Ross Kremer, and Jennifer Bouriat for Mr. Puzaitzer, of Winston & Strawn. Good afternoon, your Honor.

THE COURT: First, let me thank you for the supplemental submissions following our earlier sentencing hearing. The government's is dated April 6th, and I think the defense is the same.

MR. SHARGEL: Simultaneous briefing.

THE COURT: Right. I think the last time we were here I skipped over the preliminaries of sentencing because I was engaged in some substantive matters. Let's go back and, in a sense, start again.

Let me confirm that I have received everything that I should have. First, there is the report of the probation department bearing a cover memo date to me of January 23, 2015. Then I have the defendant's memorandum in aid of sentencing. I have a received stamp on that of February 13. It has exhibits from A to SSS. I also had received the government's sentencing memorandum bearing the date of February 24th. And I have just

mentioned the two supplemental sentencing submissions that I received after the first hearing.

Are there any other documents that I should have received in connection with the sentencing?

MR. SHARGEL: With respect to the supplemental brief that was recently filed, there was an Exhibit A, which is a letter from Mr. Puzaitzer.

THE COURT: Yes, I have it.

MR. SHARGEL: Very well. I wanted to make sure you have that. In addition, there is the offer of settlement with the SEC that Mr. Puzaitzer signed. The matter has to be reviewed by the commission, but this was in response to the civil suit filed by the SEC.

THE COURT: I'm not sure I'm aware that there was a civil suit filed by the SEC.

MR. SHARGEL: Actually, they didn't file it.

MS. BURNS: There was no suit filed by the SEC. They have been looking at the matter. As came up at the co-defendant's sentencing, their consent order is presented to the various defendants as to whether they would agree to not further --

THE COURT: Challenge?

MS. BURNS: Yes, thank you. My understanding from the SEC is that Mr. Puzaitzer signed this last week.

MR. SHARGEL: Correct.

THE COURT: What has the SEC proposed to charge him with that he is not disputing?

MR. SHARGEL: I think it is the same underlying facts of the case that you have before you.

MS. BURNS: I don't think it is anything more expansive than the original charge related to FUEG, the single stock conspiracy. That is my understanding, unless the order says something different.

MR. SHARGEL: No, that's correct.

THE COURT: Is there a sanction?

MR. SHARGEL: It is a lifetime bar from dealing in penny stocks.

THE COURT: Am I correct that Mr. Puzaitzer has no license as a broker?

MS. BURNS: That's correct, your Honor. This would prohibit him from having --

THE COURT: He, obviously, could not get one given that he has a criminal record.

MS. BURNS: Yes. Also, I believe it is broader in this language, keeping him from participating in any way. As you know, some convicted individuals find a way to get around those requirements and still somehow participate in the penny stock market. I believe this bar is intended to get to that matter as well. He did agree to that.

THE COURT: All right. Let me also confirm that both

parties received a copy of the report of the probation office.

MS. BURNS: Yes, your Honor.

MR. SHARGEL: We did.

THE COURT: Mr. Shargel, did you have the opportunity to review it with Mr. Puzaitzer?

MR. SHARGEL: Yes. It has been reviewed in detail with Mr. Puzaitzer. There is one item that I have with respect to it.

THE COURT: Please.

MR. SHARGEL: The one item that I have is an objection that in two places there is reference to a threat of violence in connection with the extortion Count, Count Two of the superseding information. The government had agreed that what he was pleading to was a threat of economic harm and not threat of harm.

At the time that Mr. Puzaitzer took his plea before the magistrate judge, he specifically said that he was admitting to threatening economic harm, and the government said nothing. In one of the memoranda submitted by the government, the original sentencing memorandum, I think it is at page 7, they said that they are accepting the plea in connection with threat of economic harm.

The further application that I have with respect to this -- is there something that your Honor doesn't see?

THE COURT: That's accurate as far as it goes. It

seemed to me that the thrust of the government's submission at page 7 was to point out that when Mr. Puzaitzer was talking to Mr. Arena and Mr. Arena was talking physical action, that Mr. Puzaitzer was not objecting. And Mr. Arena a couple of times talks about smacking, I think we all know Mr. Wainstein, around.

MS. BURNS: I want to be clear. We are not trying to back off our position on the plea in any way. The information we provided about these calls with defendant arena was in response to the defense's very extreme statements that thoughts of violence were anathema to him, not in his character and nature and we thought that wasn't fully consistent with the record.

We agree that the plea, based on economic harm, was appropriate based on the full nature of his conduct. What Mr. Shargel is asking now is that the pre-sentence report be modified. It is the government's position that that is not necessary.

For example, paragraph 60 the pre-sentence report makes clear that CC1 faced at least of economic harm from Puzaitzer. When it refers to the direct and implied threats of violence, it only lists the other co-defendants. I don't think there is an additional need for the Court to make a finding or otherwise change the pre-sentence report for that purpose.

MR. SHARGEL: First, let me say that in terms of the

threat of violence, I think we are close to the same page but not on it. I would like to remind your Honor that there was a proceeding, the bail proceeding, where your Honor went into exquisite detail about the tapes and your view of the tapes. That was at a time when you relaxed Mr. Puzaitzer's conditions of release. You made several observations that I think are pertinent to the sentence also.

THE COURT: I have not reviewed that proceeding. I assume you have a transcript. Maybe that we have it as well. If we don't, that would probably explain why I didn't review it.

MR. SHARGEL: Here is the point. This doesn't affect the guidelines. We are not talking about something that is affecting the guidelines. But it is affecting Mr. Puzaitzer's custody status. It can be expected, and people from the prison system have informed us, that it will affect his custody designation and the level of designation. That's why I'm pressing it. I just want to make that clear.

THE COURT: I understood that. Other than paragraph 60, is there any other reference that you are concerned about?

MR. SHARGEL: I'm concerned about two points in the revised probation report, which I think your Honor was referring to. There was an addendum and recommendation. Your Honor has that. But paragraph 3, page 4, and paragraph 47, page 11 -- I'll stay with paragraph 3, page 4.

THE COURT: Hold on. I think that is simply a quote of the information. I'm not prepared to change that.

MR. SHARGEL: That's all I have in terms of objections to the probation report.

THE COURT: Paragraph 60 is quite clear and draws a distinction between Mr. Puzaitzer and the other defendants. And paragraph 3 is the indictment. I don't think it would be appropriate to change that language.

MR. SHARGEL: I would ask your Honor to note for the record, so we would have the benefit of this record, that the charge and the government's position is that this was essentially a threat of economic harm. Your Honor, as I said a moment ago, carefully reviewed the minutes, the tape recordings, some of the tape recordings, and there are certain things that are worthy of note.

This was no classic extortion. Paul Arena was asked about this, and obviously his attributions are part of record. He didn't plead to the extortion. Mr. Aksanov, even though it was in his sentencing calculation, didn't plead to the extortion. As you recall, Mr. Aksanov said, I'm going to put four bullets in his chest. Sounds like something made for TV. Nevertheless, that he's what he was saying. He wasn't talking at all about economic harm.

Mr. Arena said that he was going to slap Wainstein around, and that never came to be. As I said a moment ago, he

never pled to the extortion.

Your Honor took particular note of the fact that nearly a year went by when Mr. Puzaitzer and others were essentially deprived of all of this money, that under the circumstances there was actually nothing that happened to this man. He wasn't slapped, he certainly didn't have four bullets in his chest, and he wasn't beaten in any way. The people that had provided money, a significant sum of money, were trying to get the money back and used rough language. Not Mr. Puzaitzer, by the way.

I think it is an overstatement in all respects. It is one of the counts of the indictment. It is a count to which Mr. Puzaitzer pled guilty, emphasizing threats of economic harm. I think under all of those circumstances there are mitigating circumstances here. I would ask your Honor to consider it in that way.

You considered it in that way when you released Mr. Puzaitzer on bail. You loosened the conditions of his bail from house arrest. You may remember the conditions that were set by Judge Sweet. We have been before Judge Sweet two times, and we had been before magistrate judges as well.

So, I'm asking under all of the circumstances, recognizing the fact that you are not changing or excising this -- that would be my first item on a wish list -- but recognizing that that is not going to occur, because he pleaded

guilty, as I said a moment ago, to the extortion, I would ask your Honor to give this the proper distance, respectfully, that you did at the time of the bail application. Your Honor, I have the bail transcript right here.

THE COURT: I have it. Thank you.

MR. SHARGEL: If it would help your Honor, I have page references that I could give you.

THE COURT: It's OK. Thank you.

I understand that the government's position the threats that were directly made by Mr. Puzaitzer focused on economic harm. I think my comments in connection with the bail proceeding are in a very different context and are in many ways comments on the government's choice about allowing the under-lying conduct to continue without making an earlier arrest.

If there is someplace on the judgment and conviction form to note the government's position, that can happen or you can ask the government to submit that position to the Bureau of Prisons, I guess.

MS. BURNS: Essentially, it is our position that these documents, including the pre-sentence report, are going to follow the defendant and will be reviewed in connection with his designation. We are not trying to take back anything about our view of the nature of the evidence against him.

I just think that all these materials do make that sufficiently clear for the Bureau of Prisons. If there is a

time that he gets designated to a facility and that designation seems to be based on a view that he is more violent than he is, we will happily speak to defense counsel about that and make efforts to make that clear to the purposes.

MR. SHARGEL: I appreciate what the government is saying. But when designations are made, it is not easy to achieve a transfer. Following your Honor's suggestion, I'll have further conversation with the government and put in some proposed language for it which is very narrow and reflective of what is being said here. I think that would be an enormous help to his designation.

The judgment and commitment, as your Honor knows, looks to your recommendation as to a place of confinement, and so on. We will be addressing that at the end. But I would like to reserve the opportunity to address this again by submitting something to the Court after speaking to the government.

THE COURT: I think I might write my own J&C.

I think we have gotten past the preliminaries that we in part should have gotten past the first time. Mr. Shargel, let me give you the floor.

MS. BURNS: Your Honor, before you start, are you expressly adopting the PSR at this point as it is?

THE COURT: Yes.

MS. BURNS: Thank you, your Honor.

MR. SHARGEL: Your Honor, I was going to start this afternoon's session by going back to the four questions you asked when we last appeared before your Honor on February 26th.

THE COURT: We have had Passover since then, so they have been answered. A little humor.

MR. SHARGEL: If I may respectfully, that wasn't a great joke. In any event . . .

Your Honor, you asked four questions -- there you go again -- you asked four questions at the end of the proceeding that you wanted the answers to, and then you said that you were thanking us for the submissions that were made. I think that the submissions covered the entire scope of Mr. Puzaitzer's stock investments, money lost in most cases, goals not achieved in other cases. The government went over the ten stocks that they are alleging as part of the conspiracy and Mr. Puzaitzer's guilty plea to essentially 19 stocks.

There was a time, and I don't think it is inappropriate to say this, there was a time that we had a plea agreement where Mr. Puzaitzer had the opportunity to be two levels over, at level 22, 41 to 51 months, if he had pleaded to the original FUEG, if I may call it that, indictment. But now it is clear why it occurred.

There was a threat by the government of a superseding indictment. There was a threat for greater charges. We, as a matter of plea bargaining -- and your Honor knows this, I think

it was before the Court the last time -- agreed that the plea would be taken but more coverage would be given, but it was with a 2-level bump, up to 51 to 63.

So under all of those circumstances, I'm not revisiting the various trades and various stocks involved because I think your Honor has a full handle on that with the simultaneous supplemental submissions. If that is a fair statement, I would like to move on.

THE COURT: I think it is a fair statement.

MR. SHARGEL: I would like to move on to the more conventional statement on behalf of my client.

Your Honor, the information that you have about Alex Puzaitzer is extraordinary. It's absolutely extraordinary. One of the questions you asked was whether the Russian community was a target of the conspiracy's sale of stock. Both the government and the defense answered that it was not. There is no indication in any way that anyone from the Russian community was targeted.

I tell you from the broad array of letters that you have received, this is the Russian community. This is a fair representation of the Russian community. There is so much to say about Alex Puzaitzer and his devotion to the people that he knows, to the people that he loves, first on a community basis and then on an individual basis.

I'll be talking about his family. But the support

that he has gotten in these 65 letters, probably the fattest sentencing submission that I have ever made, and the fact that these people by their presence here today showing their support for Alex Puzaitzer is extraordinary.

What I find extraordinary about these letters is not only the fact that there are 65. It's not the count or the measure or the weight of the document. That's not what I'm talking about. What I'm talking about is not writing a check to some charity, not participating at the synagogue on some holiday, but this is a man who has thoroughly, thoroughly devoted himself to the community.

What I find interesting in those letters is that there are so many people, I think it starts from a 40-year-old to an octogenarian, there are so many people who have known Mr. Puzaitzer for so many years. The preponderant majority of these letters are from people who know him for 30 or 40 years and know his good deeds to the community with sweat equity.

Not only sweat equity, but being there for people who were suffering or in need. Whether it was helping get started with a new language in a new place, whether it was helping people who suffered losses in their own families, whether it was helping the synagogue garner the support of the community to instill and inculcate their Jewish heritage, whether it was for any of that, again and again and again Mr. Puzaitzer responded in a positive way.

This is a man who didn't come here to the community as some philanthropist. This is a man you have seen in the letters who is delivering furniture at night and walking up buildings with no elevator with a couch strapped to his back, who worked hard and started a car service with one car and then there was a car service with other cars.

Yes, he tried to lift himself up by the bootstraps, but it was the bootstraps. Look at the history he has. So many people say, I come from another country and it was a little difficult to acclimate to this society, the American society. And it is true that the people who are coming to the United States, people like Alex Puzaitzer, were people who were having difficult times.

First, as you know, he went to Italy, didn't know a word of Italian, found work there, found people who are still writing letters who are so deeply, deeply fond of this man as evidenced by their presence here today. And there were more people that wanted to come. There were more people who were here, as you know, the last time, a higher count.

Under all these circumstances, we can't forget the fact that Mr. Puzaitzer suffered the indignity of antisemitism. We clearly know about the antisemitism that existed. But here is an individual, which is like Exhibit A of the suffering that Mr. Puzaitzer had, mostly mental.

He couldn't complete his education and didn't get the

diploma that he wanted and didn't get the job assignments that he wanted for one reason and one reason only, because he was Jewish. That's the only reason. He attended the school. He took the courses. He passed the exams. Yet because he was Jewish, he was not allowed to advance.

Now you see his dedication to the Jewish community, his embracing new people who have come, his essentially keeping the people who had drifted away from the religion to come closer to the synagogue. You had a letter from a rabbi, a very articulate letter, telling you how he was attempting to inculcate Jewish heritage and a respect for the religion.

This wasn't someone who had an easy childhood other-wise in the Soviet Union. You know that his father was killed in an accident when Alex was 9 years old. You know that. It's been said that unearned suffering is redemptive. What I would say is that that is something that should be taken strongly into account, both his history, when you talk about another 3553(a), history and characteristics of the defendant.

The history and characteristics of this defendant, of Alex Puzaitzer, are extraordinary. And the deeds that he accomplished when he came here to the United States were extraordinary. I think that is something that should be taken into account.

On a personal basis, he has a loving marriage of 34 years, married to a woman that he met who was also leaving the

Soviet Union, a relationship that obviously stuck when people were in transit and not deeply rooted. His loving wife Maya, who is here today, 34 years of marriage, steady as the Rock of Gibraltar. As a grandfather, as a father. I think all of that should be taken into account.

There was one thing that I would like to take into account, because I think it is of significance, and bring you back to this. You asked the question about relative culpability. The government may address that. You asked that because, and I think this is fairly put, I think you were somewhat taken aback or startled by the fact that you had so little information about the charges and what we hoped to bring to you. I think we successfully did bring the explanation.

Alex Puzaitzer wasn't in the business of pumping and dumping stocks. There are people who do that, perhaps for a living, go from one stock to another pumping and dumping stocks. That was not his livelihood. He was never the one who supplied false information that got the company up or tried to get it up so many times they failed.

You heard with the radio station a $100,000 investment brought a return of $529. Again and again he was failing in this respect. He writes in his own letter, the letter that is submitted to your Honor, Exhibit A, as to why he did, and he accepts responsibility for this completely, that in 1999 he was involved in a stock pump-and-dump scheme and he freely admits

that and freely accepts responsibility. But in terms of relative culpability, he is pretty low down on the ladder. He is not someone who is the originator or the architect of these schemes.

He explained and we explained in our memorandum about how it came to happen that after a very long time, years, from 1999 to 2011, that during that period of time he was becoming more and more successful. He was providing for his family and his children in a very positive way. There is no question about that.

He describes also the perfect storm, the confluence of events that led to his involvement in late 2011 to 2012, from Hurricane Sandy essentially demolishing his house in Brooklyn to his Zone Diet business, which was a very thriving business with many employees and good revenue. That had fallen apart. I seemed that everything that he touched was turning bad.

Out of desperation, sheer desperation, he was thinking of a way that he could make money. He had the opportunity to do it. He shouldn't have done it. He knows that. He knows that full well. Clearly, under all of the circumstances of this case, clearly this is a man that deserves consideration. This is a man who certainly deserves consideration.

There is something also I would like to note, and I think it is something that speaks in his favor. When he was interviewed by the Department of Probation he told them

squarely that he had no problem with alcohol. He is not a man who dabbles in drugs. He had no problem with alcohol and he never had a problem with alcohol. Some people are more eager to say that alcohol has plagued them at the time of interview with the probation department.

The bottom line is, and he knew it full well and recognized it at the time he went to the probation department and was interviewed, that he could receive no program, that there was no program available to him. He certainly wasn't going into the alcohol program. He didn't need it and he wouldn't be eligible for the program, for he didn't have a problem, obviously. So, when you sentence him I ask you to take into account, most respectfully, that whatever the sentence is, less the approximately 15 percent, that Mr. Puzaitzer would be serving all of that sentence.

Your Honor, Mr. Puzaitzer is going to want to make a statement, and I know that you will hear from him. I know that you will take his statement into account.

Once again, the word that I leave you with is "extraordinary." It should not have happened, this criminal activity, and no one recognizes that more than Alex Puzaitzer. It should not have happened, it did happen, it will never happen again. We have specific deterrence from the SEC agreement. Under all these circumstances, I ask you to impose a sentence as lenient as possible.

Thank you, you know.

THE COURT: Mr. Puzaitzer.

THE DEFENDANT: Your Honor, in my two letters to the Court I tried to give you a sense of who I am, where I came from and what I did. I take full responsibility for my involvement in this conspiracy. I was the first one of my co-defendants, co-conspirators I mean, to take a plea on all counts of this conspiracy.

I understand that the government is trying to focus only on my wrongdoings and it might seem like this is all I have done during this long period of time. I would like your Honor to know this is not what I have done and this is not how I earn my living. This is not the sum of my life or an accurate representation of the life I have lived.

Your Honor, for all these years I have built real profitable companies to support my family's needs. I gave employment to over 300 people. I paid hundreds of thousands of dollars in federal and state taxes. I was always there for my community. I initiated and sponsored a lot of fundraisers for good causes. I tried to help others whenever I could. I worked hard to earn my honest living. My life is not defined by stock manipulations, your Honor.

Obviously, there is no excuse for what I have done, and I regret every minute of my involvement in this conspiracy. I cannot fix anything by looking back, but I can make it right

going forward if the Court will allow me this opportunity.

I know that I have let down all those people who stood behind me all these years: My family, my friends, and my community. I can tell you that I am ashamed and I'm deeply, deeply remorseful. I can promise the Court and everyone else who came here to support me today that I'm very, very sorry and, if given another chance, I will not be in the same position again.

Thank you, your Honor.

THE COURT: Ms. Burns.

MS. BURNS: Your Honor, briefly, as we made many of our arguments in our two sentencing submissions. One thing I wanted to clarify that has come up in our submission and the defense's supplemental commission is the meetings that were had after Mr. Puzaitzer was meeting with his co-defendants.

While it was not a violation of any specific term of his bond, which we acknowledge, I think what he did not put in out submission that is relevant is that these meetings took place at his doctor's office. They were arranged by him. It speaks to a minimum that he thought he was doing something wrong and it was something secretive.

If there was nothing to hide, he could have met in any one of a million other public locations. But ranging to meet at his own doctor's office with two of his co-defendants, sometimes all of them together, sometimes just two at a time,

certainly speaks to his mindset in what he thought he was doing at that time and shows a disrespect for the bail conditions that he was granted here.

I also want to speak briefly to the explanation that the defendant offered as being conduct that he engaged in for some financial need. Frankly, your Honor, I think that explanation falls flat. The defendant was making significant amounts of money over these years leading up to his conduct in the offense.

By his own account in the pre-sentence report, up until 2009 he was getting $200,000 a year from his Zone Diet, up until 2013 he said he was getting $250,000 a year from Big Apple Management. Even as of the date of the pre-sentence report, his net worth is close to $3 million. This wasn't out of any financial need. It may have been financial want, it may have been greed, but it was certainly not a lack, a need for money.

As we are sitting here today, something that occurred to me from back during the investigation when we were going through bail and looking at his resources, in 2012, November 2012, after Hurricane Sandy, when the defendant said his home was wiped out, which we are not disputing, he had a huge, lavish 50th birthday party. Many of the people in this room were there. There is a video we saw where they were all there celebrating it.

I'm sorry about the date. 2010. It is all at the same time. 2010 is before he says he's entering this financial difficulty, but he had a good lifestyle. I think his conduct can only be explained by greed and a desire to get what he could by violating the law.

As to the community and the support he has had, it is amazing. We never see this many people really show up for a sentencing.

THE COURT: I've seen it.

MS. BURNS: Not often, right?

THE COURT: Not often.

MS. BURNS: Often, many of the people end up in the system because they don't have the support and they don't have skills and they don't have choices. This defendant had all of that. With all of that behind him, he still made the choices that landed him here today before your Honor.

For all those reasons, the government respectfully requests a sentence within the guidelines range of 51 to 63 months.

THE COURT: By the way, Mr. Puzaitzer, when you sold Zone Diet -- that it is name, right?

THE DEFENDANT: Yes.

THE COURT: -- what did you get?

THE DEFENDANT: I didn't get anything. It was the 2008 market crash. We were trying to raise money. The

business went down. We were trying to raise it, we couldn't, so basically we sold it for our debt. The company accumulated some debt, and we sold it for the debt, the name and all the intellectual property.

MR. SHARGEL: Your Honor, my understanding is that Mr. Puzaitzer had no income in the years 2012 and 2013. Perhaps more significantly, what I am hearing from the government is that they acknowledge that there was no condition of release. They said in their written submission that it was a mistake, I believe. They acknowledge that there was no condition of release about meeting with co-defendants.

Your Honor read the conditions to Mr. Puzaitzer right in the courtroom, and it was not contained within those requirements or restrictions or limitations. Yet the government feels free to stand before you and say, well, listen, in the letter of the conditions, it was the spirit. If the condition is not there, the condition is not there.

I didn't hear anything that was claimed that Mr. Puzaitzer did that was improper other than the mere or naked fact of the meetings. I certainly think that should not be taken into account. It goes like this. Violating a condition that wasn't there, but the government is saying it doesn't matter that it wasn't there, he violated anyway.

THE DEFENDANT: May I add something?

THE COURT: Sure.

THE DEFENDANT: Your Honor, first of all, in regards to me initiating all these meetings, that's a total lie. I never did that and I had no benefits in these meetings. The only thing that came out of that is the need for money. That is all the meetings were about. Basically, I did not benefit from this in any way, and I wasn't looking forward to all those meetings.

THE COURT: How many meetings were there?

THE DEFENDANT: There are a few, three or four.

MS. BURNS: Three or four in total, your Honor.

THE COURT: Mr. Puzaitzer pled guilty to a number of crimes in this case. The first was that he pled guilty to a conspiracy to commit securities fraud. That conspiracy lasted from 1999 through 2013. As part of that conspiracy and part of Mr. Puzaitzer's plea, he agreed that the loss amount from his admitted securities fraud was between the sum of 1 million to $2.5 million. He also agreed to forfeit $400,000, presumably a representation of the profit that he made or at least a compromise on that.

He also pled guilty, as you heard, to a charge of extortion and, something that received little or no comment today, to being a felon in possession of a weapon, something which felons are not allowed to do. Mr. Puzaitzer is a preexisting felon. Back in 1989 in this very courthouse he pled guilty to a stolen American Express Travelers Cheques

scheme and was placed on supervision, given a chance, no jail, placed on supervision, which ended in 1993.

When we were here the first time, I raised quite openly the question, Who am I sentencing? Am I sentencing someone who engaged in one pump-and-dump scheme or am I to sentence someone who engaged in many pump-and-dump schemes?

Based on the briefing that counsel have submitted since that first session, there is a good basis to conclude that the answer was many and that there is a basis in fact for the agreed-upon loss amount of 1 million to $2.5 million and the $400,000 forfeiture, as well as there being a good reason that highly competent defense counsel sought to get broad coverage in the plea agreement.

In reviewing the defendant's and the government's submissions after our last session, there is broad agreement on the facts concerning Mr. Puzaitzer's involvement in ten pump-and-dump schemes. Giving him the benefit of the proverbial doubt, he was clearly involved in a meaningful way in at least five of those schemes, starting in 1999 and actively in 2011, 2012, and 2013. The five, for clarity, are Global Datel, Star Energy, Faceup, All Grade Mining, and China Educational.

While to some extent there are, as I indicated, varying characterizations of Mr. Puzaitzer's roles in the various stocks, I do not accept the defendant's effort to suggest that advice, namely, brains and intelligence plus

money, equal minor role. Actually, it is the person with the brains who plays the major role, not those involved in day-to-day sales activities.

Even when Mr. Puzaitzer was less involved, he certainly didn't run away. And when he purchased stock, aware of the wrongful acts of others, it may be said that he engaged in a form of insider trading. And the fact that he and his co-conspirators may have lost money in some ventures does not eliminate their criminal nature.

That concludes the review of his criminal conduct. We now turn to his personal characteristics.

Mr. Puzaitzer is a man of many contradictions, which I think is what makes this sentence particularly challenging. He is someone who is capable of earning very substantial money but nonetheless engaged on and off in criminal conduct over two decades. On the one hand, he clearly appreciates the freedoms of his adopted country. On the other, he violates its laws.

Mr. Puzaitzer has no compelling explanation for engaging in criminal conduct. His first letter offered no explanation, and his second letter, which claimed a desire to extricate himself, is wholly inconsistent with his participating in those several meetings with his co-defendants in his doctor's office following his arrest, whether they were in technical violation of his bail or not. The bottom line is Mr. Puzaitzer is an adult responsible for his actions.

Then, on the other side, are the enormous number of letters from friends and family which support the conclusion that he is a caring and altruistic person within his community. Were it not for that array of good deeds, there is no question that his sentence would be significantly higher.

What makes it impossible to overlook his criminal conduct given the enormous and extensive good deeds is the fact that Mr. Puzaitzer's criminal conduct occurred over a very long period of time and was repeated, for reasons that are hard to explain other than the fact that the first time apparently that he engaged in a pump-and-dump scheme he made about half a million dollars.

Weighing all these factors, I'm going to sentence Mr. Puzaitzer to 28 months in custody. He is placed on supervised release for 3 years. All sentences are to run concurrently. There is a forfeiture amount of $400,000, a special assessment of $300. All of the mandatory standard and special conditions of supervised release are imposed.

Do you have the forfeiture order?

MS. BURNS: I do, your Honor. May I approach?

THE COURT: Mr. Shargel, I'm receptive to any location and timing requests.

MR. SHARGEL: Yes. First I ask for voluntary surrender.

THE COURT: OK.

MR. SHARGEL: Two, I ask for a recommendation that he be designated to Otisville camp to allow him to practice his religion most efficiently.

THE COURT: I don't know whether, given what he has pled to, he is eligible for the camp, but I don't object to that. Do you have standard surrender time?

MR. SHARGEL: Yes. It would be approximately six weeks now?

THE COURT: Sounds about right.

MS. BURNS: That's fine, your Honor.

MR. SHARGEL: Would it be possible to get a little longer time before the surrender, two months?

THE COURT: Sure.

MR. SHARGEL: Thank you, your Honor.

THE COURT: June 15th.

MR. SHARGEL: One final thing to ask. The forfeiture amount of $400,000, because of Hurricane Sandy and everything that came with it, Mr. Puzaitzer does not have the ability to make that payment and asks that he be given time to do that after he is released from prison.

MS. BURNS: Your Honor, the judgment gets entered now. My understanding from conversations with counsel before was he wasn't going to make that payment today, which is obviously fine. I don't know of any provision that permits him to delay it until after he has completed his term of incarceration. I

think a schedule could be set, any earnings he has in prison can be garnished. But delaying it until the end of his sentence, I have not done that before.

MR. SHARGEL: I think it has been done many times. I see on ECF people unable to pay are making periodic payments of certain amounts.

MS. BURNS: Right.

THE COURT: Let me say that I really don't believe that the money that is deposited in defendant's prison account should be garnished for the payment of a forfeiture amount. That's because the reality is that even though the government imprisons people, it doesn't actually provide everything that people need. It's not just about candy bars. It's really about more personal items.

I am prepared to provide that his prison account should not be garnished. As far as when he pays the forfeiture amount, I'm not sure the J&C actually -- I know it provides that for restitution.

MS. BURNS: That's correct, your Honor.

THE COURT: I'm not aware that it has a provision for paying forfeiture.

MS. BURNS: It does not. The law requires that it be imposed at sentence, which it is today. But I think that delaying it for over 2 years for an amount that has been negotiated and that the defendant is well aware of is just

unnecessary.

If there is a need that we can address with the financial litigation unit or the marshal and collection services, we can do so. I think agreeing for over two and a half years, I think there is money that can be paid in the interim in his accounts.

MR. SHARGEL: There is money to be paid in the interim, they are saying, but we are saying there is not. I will talk to people in the financial litigation department and see if I can resolve this. If it is a problem that is in the Court's jurisdiction, we will bring it back.

THE COURT: OK.

MS. BURNS: Your Honor, the government moves to dismiss the underlying indictment at this time.

THE COURT: The motion is granted.

MS. BURNS: Also, I know that defendant has waived any right to appeal the sentence that is below the stipulated guidelines range, but if your Honor could advise him of any other appellate rights that remain.

THE COURT: As you know, Mr. Puzaitzer, as part of your plea agreement you waived the right to appeal the sentence that I imposed because it is lower than the stipulated guidelines amount. But if there is some other basis for you to appeal, you have the right to do so within 14 days. Thank you.

(Adjourned)